## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**SHANNON LESLI LEVY,**

    **Plaintiff,**

**vs.**                                      **Case No.  1:15cv251-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

    **Defendant.**

_____/

## REPORT AND RECOMMENDATION

    This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. ' 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act).  After consideration of the record, it is recommended that the decision of the

Commissioner be reversed and the case remanded for further consideration.

## I. Procedural History

On April 12, 2012, Plaintiff, Shannon Lesli Levy, filed an application for DIB alleging disability beginning January 26, 2012, complaining of diabetes, degenerative disc disease, Graves' disease, bursitis, and overactive bladder.  Tr. 27, 150-51, 166, 170.  (Citations to the transcript/administrative record, ECF No. 10, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured for DIB is December 31, 2016.  Tr. 27, 166.

Plaintiff's application was denied initially on May 17, 2012, and upon reconsideration on July 17, 2012.  Tr. 27, 77-92.  On September 11, 2012, Plaintiff requested a hearing.  Tr. 27, 93-94.  On February 6, 2014, Administrative Law Judge (ALJ) Thomas J. Gaye held a video hearing and presided from San Jose, California.  Tr. 27, 43-76.  Plaintiff appeared and testified in Gainesville, Florida, Tr. 48-71, and was represented by Elizabeth F. Stakenborg, an attorney.  Tr. 27, 43, 45, 117-18, 120.  Rebecca Hayes, M.Ed., L.P.C., an impartial vocational expert (VE), testified during the hearing.  Tr. 27, 71-74, 143 (Resume).

On February 27, 2014, the ALJ issued a decision and denied
Plaintiff's application for benefits concluding that Plaintiff was not disabled
from January 26, 2012, through the date of the ALJ's decision.  Tr. 27-28.

On April 15, 2014, Plaintiff requested review of the ALJ's decision
and requested additional time to submit additional evidence and included a
memorandum and additional patient medical records from Eric Scott, M.D.,
August 24, 2012, to February 10, 2014, (Tr. 466-83 (Exhibit 15F)), and
Prathima Reddy, M.D., February 19, 2014.[1]  Tr. 4-5, 21-23, 221-24; *see
infra* at 28-29, 36 nn. 9 & 13.  On June 18, 2014, the Appeals Council
granted Plaintiff's request for additional time to submit "more evidence or a
statement about the facts and the law in this case" and gave Plaintiff 25
days to submit additional evidence.  The Appeals Council also advised that
"[a]ny more evidence must be new *and* material to the issues considered in
the hearing decision dated February 27, 2014."  Tr. 7, 14.

On September 21, 2015, the Appeals Council considered Plaintiff's
request for review and mentioned Exhibits 17F, page 492, and 18F, pages
493-516, but not Exhibits 15F, pages 466-83, and 16F, pages 484-91.

---

[1]  At the time of his decision, the ALJ had before him Exhibits 1A through 14F.
*See* Tr. 39-42; *see also* Tr. 31, 34-35 (references to Exhibit 14F).  (At the hearing,
without objection, the ALJ admitted Exhibits 1A through 13F into evidence.  Tr. 47.)
Exhibits 15F and 16F *pre-date* the ALJ's decision, whereas Exhibits 17F and 18F *post-date* the ALJ's decision.

Tr. 1-5; *see supra* at n.1.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5; *see* 20 C.F.R. § 404.981.

On November 11, 2015, Plaintiff, by counsel, filed a Complaint with the United States District Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 12 and 15, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2016."  Tr. 29.

2. "The claimant has not engaged in substantial gainful activity since January 26, 2012, the alleged onset date."  *Id.*

3. "The claimant has the following severe impairments: degenerative disc disease of the cervical spine and lumbar disc displacement."  *Id.*  The ALJ considered whether other reported impairments were severe, including diabetes, hypothyroidism, swollen left elbow, allergies and urinary incontinence, and depression, and determined they were non-severe.  Tr. 29-31.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Tr. 31.

5. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) except that

the claimant is limited to occasional climbing stairs and ramps. The claimant is limited to occasional stooping, kneeling, crouching, crawling and balancing.  The claimant is limited to occasional reaching overhead with the right upper extremity.  The claimant is limited to occasional pushing and pulling right arm controls using the dominant right upper extremity.  The claimant must avoid concentrated exposure to extreme cold and heat.  The claimant must avoid concentrated exposure to work-related hazards (unprotected heights and dangerous machinery)."  Tr. 32.

6. "The claimant is unable to perform any past relevant work."  Tr. 37.

7. "The claimant was born [in 1966] and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date."  *Id.*  "The claimant has at least a high school education and is able to communicate in English."  *Id.*

8. "The claimant has acquired skills from past relevant work" as a state trooper, which has a Dictionary of Occupational Titles (DOT) number of 375.263-018, which the VE noted was a medium level exertional job, with a Specific Vocational Preparation (SVP) of 6 consistent with semi-skilled work.  *Id.*

9. "Considering the claimant's age, education, work experience, and [RFC], the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existed in significant numbers in the national economy."  Tr. 37-38.  The VE testified that Plaintiff could perform representative occupations including security work with seven job titles, light exertion with an SVP of three with a representative job noted as gate guard, light exertion with an SVP of 3.[2]  Tr. 38.

---

[2]  "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties.  Semi[skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment , property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."  20 C.F.R. § 404.1568(b).  An SVP of 3 means "[o]ver 1 month up to and including 3 months."  Dictionary of Occupational Titles (DOT)

10.   "The claimant has not been under a disability, as defined in the Social Security Act, from January 26, 2012, through the date of" the ALJ's decision. *Id.*

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence

---

(4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds. . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time"  20 C.F.R. § 404.1567(b).

preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must

consider four factors: '(1) objective medical facts or clinical findings; (2)

diagnosis of examining physicians; (3) subjective evidence of pain and

disability as testified to by the claimant and corroborated by [other

observers, including family members], and (4) the claimant's age,

education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations

omitted).

A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage

in any substantial gainful activity by reason of any medically determinable

---

[3] "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,
1240 n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ.  A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence
relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).
"Unless the Secretary has analyzed all evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is supported
by substantial evidence approaches an abdication of the court's 'duty to scrutinize the
record as a whole to determine whether the conclusions reached are rational.'"  Cowart
v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.    Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

---

[4]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), (a)(3).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility

  5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two in

disapproval of the application for benefits.  A positive finding at step three

results in approval of the application for benefits.  At step four, the claimant

bears the burden of establishing a severe impairment that precludes the

performance of past relevant work.  Consideration is given to the

assessment of the claimant's RFC and the claimant's past relevant work.  If

the claimant can still do past relevant work, there will be a finding that the

claimant is not disabled.  If the claimant carries this burden, however, the

burden shifts to the Commissioner at step five to establish that despite the

claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work

experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

---

for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* SSR
(SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional
capacity assessment*" describes an adjudicator's finding about the ability of an individual
to perform work-related activities.  The assessment is based upon consideration of all
relevant evidence in the case record, including medical evidence and relevant
nonmedical evidence, such as observations of lay witnesses of an individual's apparent
symptomatology, an individual's own statement of what he or she is able or unable to
do, and many other factors that could help the adjudicator determine the most
reasonable findings in light of all the evidence.").

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).
If the Commissioner carries this burden, the claimant must prove that he or
she cannot perform the work suggested by the Commissioner.  Hale v.
Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

     The opinion of the claimant's treating physician must be accorded
considerable weight by the Commissioner unless good cause is shown to
the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).
This is so because treating physicians "are likely to be the medical
professionals most able to provide a detailed, longitudinal picture of your
medical impairment(s) and may bring a unique perspective to the medical
evidence that cannot be obtained from the objective medical findings alone
or from reports of individual examinations, such as consultative
examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This
requires a relationship of both duration and frequency."  Doyal v. Barnhart,
331 F.3d 758, 762 (10th Cir. 2003).  "'The treating physician doctrine is
based on the assumption that a medical professional *who has dealt with a*
*claimant and his maladies over a long period of time* will have a deeper
insight into the medical condition of the claimant than will a person who has
examined a claimant but once, or who has only seen the claimant's medical

records.'  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)."  *Id.*

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical

or laboratory findings," or the opinion "is not accompanied by objective

medical evidence."  Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583

(citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further,

where a treating physician has merely made conclusory statements, the

ALJ may afford them such weight to the extent they are supported by

clinical or laboratory findings and are consistent with other evidence as to a

claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th

Cir. 1986).

## IV.  The Evidence

### A.  Relevant Medical Evidence

Plaintiff's alleged onset of disability is January 26, 2012.  Prior to her

onset date, she received treatment from March 2010 through August 2010

from Dr. John Hoehn, a chiropractor, for left and right neck stiffness.

Tr. 267-70, 285-86; *see* Tr. 32.  Plaintiff was seen monthly for neck

stiffness and pain and stiffness in both sides of her upper and lower back.

Examination revealed spasm and tenderness over the lower cervical

region, palpation of the thoracic spine indicates spasm and tenderness

over the middle and lower region, and spasm and tenderness over the

entire lumbar spine.  Also in 2010, she received treatment from Sujata

Wagh, M.D., for diabetes mellitus.  Tr. 307-09; *see* Tr. 32.  She reported

having severe hypoglycemic episodes at work.  Since the beginning of

2010, her blood sugar control had been poor and she was very stressed.

She was diagnosed with diabetes mellitus type I and was told to continue

on Lantus and Humalog.  *Id.*  Plaintiff received more treatment from

Dr. Hoehn for her neck pain and stiffness through November 2010.

Tr. 265-66; *see* Tr. 32.

Plaintiff was treated in early January 2011 by Robert Ashley, M.D.

Tr. 320-24; *see* Tr. 33.  She was experiencing bladder urgency and

incontinence and was diagnosed with incomplete emptying of the bladder.

Plaintiff was then referred to a urologist the same month.  Sean

McLaughlin, M.D., a urologist, examined Plaintiff.  Tr. 366-67.  Plaintiff

reported leakage with coughing, sneezing, and activities for the past

several years that had worsened over the past year.  She was diagnosed

with stress urinary incontinence and was advised to undergo sling surgery.

*Id.* On February 7, 2011, she presented with stress incontinence.  Tr. 364-

65.  She underwent a urodynamic study of the bladder and was diagnosed

with type II stress urinary incontinence.  She was advised to undergo

surgery to place a midurethral sling.  *Id.*

Plaintiff continued to receive treatment between March 2011 through

June 2011 for neck and back pain.  Examination revealed spasm and

tenderness of her lumbar spine.  On May 2, 2011, Plaintiff underwent a

cervical spine x-ray.  Tr. 283.  Her x-ray revealed degenerative disc

disease and degenerative joint disease of the cervical spine with stenosis

of the right C5-6 level from spur formation.  An MRI was recommended.  *Id.*

Plaintiff was seen from June 2011 through July 2011 by Dr. Wagh for

diabetes mellitus.  Tr. 301-06.  On June 16, 2011, she reported fatigue,

weight change, and urinary frequency.  Tr. 304-06.  Examination revealed

an elevated hemoglobin A1C and she was told to restart Humalog,

Pravastatin, and was changed to the Lantus solostar.  *Id.*  Plaintiff

presented on July 21, 2011, after having a severe hypoglycemic episode at

work.  Tr. 301-03.  She was found at the Georgia border and it was

reported she was driving her patrol car and swerving on the highway.  She

stated she does not remember the episode.  She was diagnosed with

diabetes mellitus type I, uncontrolled, and hypoglycemia.  She was advised

to change to day shift, to split her Lantus dose, and to test her blood sugars

every two hours at work.  *Id.*  Plaintiff continued treatment for neck and

back pain through November 2011 with Dr. Hoehn.  Tr. 249, 256-58.

Examination revealed spasms, tenderness, and reduced range of motion of

her cervical spine, and spasm of her lumbar and thoracic spine.

Plaintiff started seeing Robert Valentine, Jr., M.D., with Medical Associates, Gainesville, Florida, between August 25, 2011, through October 2011 due to continuing neck and back pain. Tr. 228-33; *see* Tr. 32-34.

On August 25, 2011, she presented for the first time with neck and low back pain, which existed for a few years.  Tr. 228-32, 237-46, 360-63; *see* Tr. 32.  She rated her pain as a seven out of ten (7/10) and reported undergoing physical therapy and chiropractic treatment.  Her pain was decreased by heat, cold, massage, and muscle relaxers and unaffected, in part, by sitting, standing, walking, bending forwards or backwards, and sideways, twisting, lifting, after exercise, cough/sneeze, rising from the bed or chair, or riding in a vehicle.  Tr. 229.  She reported chiropractic and massage to be very helpful, exercise of little help, and OTC medications somewhat helpful.  *Id.*  She did not consider herself disabled by pain.  *Id.* Examination of the cervical and thoracic spine areas produced generally normal results, including full cervical ROM, cervical spinous processes and cervical facet joints were nontender; thoracic kyphosis was normal, no thoracic facet joint tenderness, thoracic TrP was palpated, and TrP rhomboids, right rhomboid major; lumbar flexion was limited, lumbar extension was extremely limited, no lumbar facet joint tenderness,

tenderness at L5 (lumbar spine), lumbar muscular tenderness present, no lumbar spasm, no sacroiliac joint tenderness, and negative Trendelenburg test . Tr. 231.  Plaintiff's gait was normal and she performed tandem walking.  *Id.*  Regarding "motor," her biceps, triceps, wrist, shoulder were normal bilaterally as were her hip, knee, ankle, and EHL; she was able to walk on toes and heels and no give way was noted.  Tr. 228.  Her SLR (sitting) was negative for radicular and lumbar pain.  Hoffman and Babinski signs and clonus were absent.  Adson test was negative bilaterally. Plaintiff was alert, oriented, her affect was stable, and no pain behavior was exhibited.[5]  *Id.*  Dr. Valentine's impressions included myofascial pain, right rhomboid major and possible facet pain, but joints were not tender to palpation.  Possible radicular pain was noted, but "unable to reproduce and appears to be neurologically intact on exam."  *Id.*  She underwent trigger point injections into the right rhomboid major and was advised to perform stretching exercises three to four times daily.  *Id.*  On October 17, 2011, she again reported right shoulder blade pain, neck and back pain.  Tr. 232-33, 247-48.  She underwent another trigger point injection to the right rhomboid major.  *Id.*

---

[5]  Similar physical examination findings are reported by Drs. Valentine and Reddy in other patient notes.  *See, e.g.,* Tr. 237-40, 247, 360-63, 424-26, 443-44, 446-52, 457-61, 463-64, 495, 504-05.

From September 2011 through November 2011, Dr. Ashley treated

Plaintiff for urge incontinence.  Tr. 325-32; *see* Tr.33.  On September 2,

2011, she presented with reports of frequent urination.  Tr. 325-26.  She

was treated with Vesicare tablets for urge incontinence.  *Id.*  On November

15, 2011, Plaintiff described swelling over the left elbow.  Tr. 331-32.

Examination revealed a swollen left olecranon bursa.  Plaintiff was referred

to an orthopedist.  *Id.*

Phillip L. Parr, M.D., an orthopedist with The Orthopaedic Institute,

examined Plaintiff on November 23, 2011.  Tr. 348-49.  Examination

revealed a golf ball sized cystic swelling in the olecranon bursa.  Plaintiff

was diagnosed with olecranon bursitis of the left elbow.  She underwent

aspiration of the bursa and a steroid injection into the left elbow.  *Id.*

On December 15, 2011, Dr. Wagh treated Plaintiff for diabetes

mellitus.  Tr. 297-300; *see* Tr. 33.  She reported starting a new job as a

police officer and was willing to transition to an insulin pump.  She was

diagnosed with uncontrolled diabetes mellitus type I and told to continue on

Humalog and Lantus.  She was referred for a DEXCOM insulin pump.  *Id.*

Plaintiff did not complain of back or neck pain, *id.*, as noted by the ALJ,

Tr. 33.  Dr. Wagh noted, however: "Musculoskeletal exam reveals - no

evidence of proximal muscle weakness[.]  Motor strength is 5/5 in the upper

and lower extremities and gait and station were normal.  [T]he spine is nontender to palpation.  Distal extremities reveal - no hypertrophy or discoloration of the nails is seen.  No evidence of sores seen on the feet." Tr. 299.

On January 24, 2012, Dr. Hoehn again treated Plaintiff.  Tr. 255. Examination revealed spasm and tenderness of her cervical and lumbar spine and she underwent spinal manipulation and mechanical traction.  *Id.*

Dr. Wagh treated Plaintiff from March 2012 through September 2012. Tr. 289-96, 408-18; *see* Tr. 33.  On March 22, 2012, her hemoglobin A1C was elevated.  Tr. 293-96.  She reported morning hypoglycemia, but did not want to transition to the pump.  *Id.*  Muscle pain is noted under review of systems/musculoskeletal.  Tr. 294.  Under physical exam, Dr. Wagh noted the same findings under musculoskeletal, as she did on December 15, 2011, Tr. 299, but added: "Distal extremities reveal - nails are thickened, discolored, or disfigured - consistent with onychomycosis (Great toes only)."

On April 12, 2012, her blood work showed a low thyroid stimulating hormone value.  Tr. 289-92.  Plaintiff underwent a neck ultrasound that showed thyroid pseudonodules.  She was diagnosed with Graves Disease and uncontrolled diabetes mellitus.  She was prescribed Methimazole and

was told to reduce her Lantus dose due to late afternoon hypoglycemic. Plaintiff did not want to transition to the insulin pump due to afternoon hypoglycemia. *Id.* Under review of systems and musculoskeletal, back pain was reported for the first time to Dr. Wagh. Tr. 290. Within the physical examination portion of the notes and under the musculoskeletal exam heading, it was noted that there is was evidence of proximal muscle weakness; motor strength was 5/5 in the upper and lower extremities; gait and station were normal; and the spine was nontender to palpation. Nails were discolored. Tr. 291; *see* Tr. 33.

On June 20, 2012, her recent blood work was reviewed and her medications were adjusted. Tr. 415-18. Her late afternoon hypoglycemia had improved. Dr. Wagh noted that Plaintiff was not interested in an insulin pump. She exercised by working in her yard; she did not do aerobic exercises. She was restarted on Pravastatin. Tr. 415. Back, muscle, and neck pain were noted. Tr. 416. On September 12, 2012, laboratory values were again abnormal. Her thyroid stimulating hormone level was low at 0.27 with normal range being 0.40-4.50. Tr. 408-13. Although noted as better, her hemoglobin A1C was elevated at 7.4 with normal range being below 5.7. She was told to decrease her Methimazole dose and continue on Lantus and Humalog. She continued to work in the yard. "She

exercises regularly and appropriately for age and health, predominantly swimming." Tr. 409; *see* Tr. 403. Neck, muscle, and back pain were noted. Tr. 409. On December 12, 2012, Dr. Wagh noted that Plaintiff's A1C was 7.5; she received shots in her neck intermittently for cervical pain issues; she otherwise feels well; no complaints; no significant hypoglycemia. Tr. 402. She continued to exercise, predominantly swimming. Tr. 403. Neck and back pain were noted. *Id.*

On September 11, 2012, Dr. Reddy, also with Interventional Medical Associates, Gainesville, Florida, examined and treated Plaintiff.[6] Tr. 448-52. Progress notes dated September 11, 2012, revealed reports of neck and right arm to index finger pain, with an intensity of 8/10. Tr. 448. Plaintiff's past medical and surgical history was noted as myofascial pain; disc displacement, lumbar protrusions multiple levels at L3-4; spondylosis, lumbosacral; low back pain; radiculitis, lumbar/thoracic (right); and post-laminectomy synd., lumbar. Plaintiff did not consider herself disabled by pain. Tr. 449. The positive findings for a review of systems were neck and back pain and frequent urination. Tr. 450. There are also numerous

---

[6]  On July 17, 2012, Nicolas Bancks, M.D., a non-examining, State agency consultant, provided an RFC assessment as part of a reconsideration review. Tr. 389-93. Dr. Bancks reviewed patient records from August 2011 through May 2012. Tr. 390-91. He determined that Plaintiff could perform light work with restrictions. Tr. 390-93. The ALJ gave "great weight" to Dr. Bancks' opinion. Tr. 37.

negative findings.  *Id.*  A physical examination of Plaintiff's cervical spine noted: cervical ROM full; cervical spinous processes non-tender; cervical facet joints non-tender; and no cervical muscle spasm.  *Id.*  It is noted under thoracic spine: thoracic kyphosis normal; no thoracic facet joint tenderness; thoracic TrP palpated; TrP rhomboids, right rhomboid major. Tr. 451.  It is noted under lumbar spine: lumbar flexion limited; lumbar extension extremely limited; no lumbar facet joint tenderness; lumbar spinous process tenderness present L5; lumbar muscular tenderness present; no lumbar spasm; no sacroiliac joint tenderness; and negative Trendelenburg test.  It is noted under extremities: no clubbing, no extremity cyanosis; no pretibial edema; no pedal edema; trochanters non-tender, gluteals non-tender, knee and ankle ROM full.  *Id.*  It is noted, in part, under neurology: gait normal; tandem walking performed; biceps, triceps, wrist, shoulder normal bilaterally; hip, knee, ankle, EHL normal bilaterally; able to walk on toes and heels; no giveway noted; DTR's - normal in biceps, brachioradialis, triceps bilaterally and normal in knees and ankles bilaterally; SLR (sitting) - negative for radicular and lumbar pain; Hoffman sign absent; clonus absent; Babinski sign absent; and no dysmetria. Adson test was negative bilaterally.  Plaintiff was alert, oriented, her affect

was stable, and no pain behavior was exhibited. *Id.*; *See also* Tr. 237-40,

247, 360-63, 424-26, 443-44, 446-52, 457-61, 463-64, 495, 504-05.

The same progress notes discuss the 2012 cervical spine MRI

results: retrolisthesis and degenerative disc bulging at C5-6 causing central

mild stenosis with facet arthrosis with foraminal stenosis with foraminal

stenosis; C6-7 herniated nucleous pulposus (HHP) right paracentral with

moderate foraminal stenosis on the right and mild foraminal narrowing on

the left; and mild disc bulge at C4-5 without disc protrusion or stenosis with

facet arthosis. Tr. 452; *see* Tr. 34. Impressions included myofascial pain,

right rhomboid major and cervical spine; possible facet pain, referral pattern

is comparable with lower/middle facet joints on the right, cervical neck pain

with motion especially extension; cervical radicular pain right C6-7 due to

cervical foraminal stenosis from disc HHP and facet arthrosis. *Id.* The plan

included, in part, trigger point injection, daily stretching program,

consideration of other tests. *Id.* These progress notes as well as others

were sent to Drs. Hoehn, Ashley, and Wagh. *See, e.g.*, Tr. 248, 363, 447,

522-23.

On September 24, 2012, Plaintiff reported to Dr. Valentine for a

cervical epidural injection, having been referred by Dr. Reddy. Plaintiff was

having right C6/7 radicular pain with right C6/7 paracentral HHP and right

foraminal stenosis.  Tr. 453.  She underwent a cervical spine epidural injection at C7-T1.

Plaintiff continued to report neck pain to Dr. Valentine as of January 7, 2013.  Tr. 454-56.  She underwent trigger point injections to the right rhomboid major and right levator scapulae.  *Id.*

On January 7, 2013, Plaintiff was examined by Dr. Reddy.  Tr. 454-56.  The results of the physical examination were the same as reported on September 11, 2012.  *See, e.g.*, Tr. 228-32, 237-40, 247, 360-63, 424-26, 443-44, 446-52, 457-61, 463-64, 495, 504-05.

On February 18, 2013, she was examined by Dr. Reddy and reported continued neck and shoulder pain.  Tr. 457-59; *see* Tr. 34.  This time, she underwent Botox injections into the bilateral upper trapezius, left splenius cervical, bilateral upper thoracic and rhomboids, left levator scapulae, bilateral splenius, and cervical paravertebrals.  Plaintiff was prescribed Tramadol and started on Robaxin for cervical spasms.  *Id.*  The results of the physical examination were the same as prior examination results.

On April 8, 2013, Plaintiff was examined by Dr. Reddy and continued to have right sided neck and shoulder pain.  Tr. 424-26, 460-62.  She only had temporary relief with trigger point injections and Botox injections and

was referred to Dr. Scott for a neurosurgical evaluation.  *Id.*  Physical

examination results were the same as prior results.

Plaintiff also continued to receive chiropractic treatment from

Dr. Hoehn from November 2012 through February 2013.  Tr. 427-40.  On

February 4, 2013, Dr. Hoehn's plan included Plaintiff continuing isometric

stretching and strengthening programs to increase ROM and build core

muscle stability and continue NMMT for pain/spasm in areas of complaints.

Tr. 440.

Progress notes dated June 12, 2013, revealed additional care by

Dr. Wagh.  Tr. 397-401.  Plaintiff had worsening A1C values (8.4) and

again was advised to have insulin pump, but wanted to wait another six

months.  She was continued on Lantus, Humalog, and Methimazole for

hyperthyroidism.  It is noted that Plaintiff "just had neck surgery for cervical

fusion.  She denies polyuria, nocturnal/tingling numbness in her feet. She

o/w feels well, no complaints."  Plaintiff reported experiencing

hypoglycemia almost daily and in the daytime related to yard work.

Tr. 397.  Neck and back pain were noted.  It is again noted that Plaintiff

exercises regularly and appropriately for her age and health, predominantly

swimming.  Tr. 398.

On July 29, 2013, Plaintiff was examined by Dr. Reddy and complained of pain located in the back of her skull and pain in her neck and low back.  The intensity was 2-3/10.  Tr. 463; *see* Tr. 34.  The results of the physical examination were the same as prior results.  Tr. 463-64; *Compare with* Tr. 228-32, 237-40, 247, 360-63, 424-26, 443-44, 446-52, 457-61, 495, 504-05.  The plan included the following: "patient is S/P cervical a CDF with radicular arm pain resolved - will recommend patient follow up with [Dr.] Eric Scott - continue tramadol and robaxin for cervical spasms and pain."  Tr. 465.  (This is the last page of the record that was before the ALJ.)

On October 23, 2013, (per Exhibit List), Dr. Reddy completed a medical source statement regarding Plaintiff.[7]  Tr. 422-23.  Plaintiff could lift and carry ten pounds occasionally and five pounds frequently and could sit for two hours total and stand and walk for one hour during an eight hour workday.  Tr. 422.  She could sit at onetime for an hour and stand or walk for one hour before needing to get up and move around.  Plaintiff needed to alternate sitting and standing (every hour) to relieve pain or discomfort and

---

[7]  As noted by the ALJ, the physician signature is not legible.  Tr. 36, 423.  The ALJ assumed it was Dr. Reddy.  *Id.*  The ALJ reasoned that the signature was Dr. Reddy's because on November 20, 2013, Dr. Reddy noted, as part of the plan, "disability forms faxed."  Tr. 36, 444.  The medical source statement is primarily a check-off form.  Tr. 422-23.

she should avoid dust, fumes, gases, extremes of temperature, humidity, and other environmental pollutants.  She could never work with hazardous machinery and could rarely climb, balance, bend, or stoop.  Plaintiff could occasionally engage in gross and fine manipulation, in reaching, pulling/ pushing (arm and/or leg controls), and operating a motor vehicle.  *Id.* Plaintiff would likely be absent from work two days per month as a result of her impairments due to cervical brachial pain, cervical radicular pain, lumbar radiculopathy and status post cervical fusion.  Tr. 423.  These restrictions applied as of September 12, 2013.  *Id.*

On November 20, 2013, Dr. Reddy examined Plaintiff who complained of current pain in between the right side and pain in the "right wrist/SI."[8]  Tr. 441.  Plaintiff reported no new pain complaints since the last visit.  *Id.*  Her pain intensity was 3.5/10.  *Id.*  From a neurological standpoint, Plaintiff reported "[w]eakness of arms or legs, right arm. Trouble using your hands.  (right)."  *Id.*  Plaintiff denied loss of consciousness and balance, trouble walking, and numbness of arms or legs.  *Id.*  Dr. Reddy performed a physical examination that included the musculoskeletal system.  Tr. 443.  Regarding the cervical spine, inspection and palpation revealed: "cervical ROM full, cervical spinous processes

---

[8]  The ALJ noted that this was Plaintiff's last visit with Dr. Reddy.  Tr. 34.

nontender, cervical facet joints nontender, no cervical muscle spasm." *Id*.

Regarding the thoracic spine and range of motion, it is noted: "thoracic

kyphosis normal, no thoracic facet joint tenderness, thoracic TrP palpated,

TrP rhomboids, right rhomboid major." *Id*.  Regarding the lumbar spine, it

is noted: "Normal: "lumbar FLEXION limited, lumbar EXTENSION

extremely limited, no lumbar facet joint tenderness, lumbar SPINOUS

PROCESS TENDERNESS present L5, lumbar MUSCULAR

TENDERNESS present, no lumbar spasm, no sacroiliac joint tenderness,

negative Trendelenburg test." *Id*.  Regarding extremities, it is noted: "no

clubbing, no extremity cyanosis, no pretibial edema, no pedal edema,

trochanters nontender, gluteals nontender, knee ROM full, ankle ROM full."

*Id*.; *compare with* Tr. 228-32, 237-40, 247, 360-63, 424-26, 446-52, 457-61,

463-64, 495, 504-05.  Plaintiff was diagnosed with post-laminectomy

syndrome, cervical muscle spasm and diabetes mellitus.  *Id.*  From a

neurological standpoint, Plaintiff's gait was normal and tandem walking was

performed.  Her biceps, triceps, wrist, and shoulder were normal bilaterally.

Her hip, knee, ankle, and EHL were normal bilaterally.  Plaintiff was able to

walk on toes and heels.  No giveway was noted.  "DTR's: normal in biceps,

brachioradialis, triceps bilaterally.  DTRs: normal in knees and ankles

bilaterally, SLR (sitting) negative for radicular pain, SLR (sitting) negative

for lumbar pain, Hoffman sign absent, clonus absent, HKS/FNF performed, No dysmetria." *Id*. From a psychiatric standpoint, Plaintiff was alert and oriented; her affect was stable; and pain behavior was not exhibited. *Id*. Dr. Reddy's diagnoses included: post-laminectomy syndrome cervical; cervicobrachial syndrome; muscle spasm; and diabetes uncomplicated type I "Uncont." *Id*. Plaintiff was to follow-up as needed. Tr. 444. A care plan included home exercise program. Topical analgesic was reordered, disability forms were faxed, and massage therapy recommended. *Id*.

## B. Medical evidence submitted to the Appeals Council.

## 1. Introduction

Exhibits 1A through 14F were presented to the ALJ. Tr. 39-42. Exhibit 14F (pages 1-25) ends at page 465 and thereafter the pages are numbered consecutively starting on page 22 of 72 to page 72 of 72. *See* Tr. 466-516. It appears that Exhibit 15F (Tr. 466-83), Exhibit 16F (Tr. 484-491), Exhibit 17F (Tr. 492), and Exhibit 18F (Tr. 493-516) were provided to the Appeals Council *after* the ALJ rendered his decision. The Appeals Council referred to Exhibits 17F and 18F, which appear in the record at pages 492-516, but not to Exhibits 15F and 16F.[9]

---

[9] The documents included in Exhibit 15, Tr. 466-83 (beginning page 22 of 72), are mentioned in Plaintiff's post-hearing memorandum submitted to the Appeals Council on April 15, 2014. Tr. 223; *see supra* at 2-3. The other document mentioned by Plaintiff in her post-hearing memorandum is from Dr. Reddy dated February 19, 2014, which

Tr. 5.

During the hearing, the ALJ stated that he was aware that Plaintiff had a cervical fusion.  Tr. 56.  Plaintiff's counsel responded that they "were trying to get records from a Dr. Eric Scott, who did a cervical fusion on her back in April.  And we just paid for them, although we've been requesting them since September.  So I'm not sure what's taking so long.  So I apologize.  I'm going to have her testify about the treating with Dr. Scott." *Id.*  Plaintiff described her treatment leading up to her examination and ultimate surgery with Dr. Scott.  Tr. 56-59.  Plaintiff testified that the cervical fusion resolved her symptoms for a few months and "[i]t was very nice." Tr. 59-60.  Plaintiff returned to Dr. Reddy because the pain in her muscles returned.  Tr. 60.  Dr. Reddy "explained [to her] that the arthritis in [her] neck was still there and they couldn't get rid of that.  That this would continue to happen."  *Id.*  Plaintiff stated that the symptoms she experienced related to her neck were "[j]ust the pain in [her] back."  *Id.*  The pain was not as bad as it was prior to surgery, but "it's there," from her neck

---

does not appear in the record, *id.*, although Dr. Reddy noted on April 3, 2014, "Carpel Tunnel Syndrome (disorder) (Onset: 02/19/2014 – Active."  Tr. 497.  During the hearing, Plaintiff mentioned having a nerve conduction test re-scheduled for February 19, 2014, ordered by Dr. Scott.  Tr. 63-66.  The ALJ mentioned this test, but declined to wait for the study "as it is highly unlikely to have any impact on the claimant's [RFC]."  Tr. 36; *see infra* at 36-37 n.13.

and shoulder into her arm and into her index finger joint on her right hand.
*Id.* She described additional problems she was having.  Tr. 61-62.

After the VE testified and before the hearing ended, the transcript
does not indicate that Plaintiff's counsel requested the ALJ to keep the
record open pending receipt of the missing medical records, including the
cervical fusion operative report and other patient records from Dr. Scott and
the results of a scheduled test (nerve conduction study).[10]  Tr. 35-36. On
June 18, 2014, the Appeals Council granted Plaintiff's counsel's request for
an extension of time, Tr. 21-23, 221-24, to submit additional evidence.
Tr. 7, 14; *see supra* at 2-3 and n.1.

In his decision, the ALJ stated that Plaintiff testified that she
underwent a cervical fusion by Dr. Scott in April 2013, "yet the claimant did
not provide an operative report and a June 2013 record makes no mention
of a cervical fusion.  (Exhibit 11F/1-04 [Tr. 397-400 (Dr. Wagh's patient
notes of June 12, 2013)]."  Tr. 35.  The ALJ was partially mistaken.

---

[10]  *See generally* 20 C.F.R. § 405.331(a) & (c); *see also* HALLEX I-2-7-20, 1993
WL 751909 (Updated, Sept. 2, 2005) ("When a claimant or representative requests time
to submit evidence or written arguments after the hearing, the ALJ must set a time limit
for the posthearing actions to be completed and inform them that if the material is not
received within the time limit, absent a showing of good cause to extend the time, the
ALJ will issue a decision without the material.").

Dr. Wagh noted in the same patient record of June 12, 2013, that Plaintiff

"just had neck surgery for cervical fusion."  Tr. 397.  No operative report

was provided to the ALJ.

### 2.  The post-ALJ decision evidence.

Notwithstanding, the following is a summary of the evidence that

appears in the record *after* the ALJ rendered his decision.

An EMG/NCV study was performed in September 2012 that showed

evidence of borderline carpal tunnel syndrome which was asymptomatic at

that time.  Tr. 480-81.

Although Dr. Scott, her treating neurosurgeon, is referred to in patient

records that were before the ALJ, Dr. Eric Scott's patient records were not

obtained until *after* the ALJ denied Plaintiff disability benefits.  *See supra* at

2-3 and n.1.

Dr. Scott treated Plaintiff from April 12, 2013, through May 30, 2014.

Tr. 469-79, 492.  On April 12, 2013, Plaintiff reported pain in the back of the

right cervical region that radiated under the shoulder down the triceps and

finger tips of her right hand.  Examination revealed trace weakness of the

right triceps with some applicable atrophy in the right triceps.  Her MRI of

the cervical spine was reviewed.  Plaintiff was noted to have focal

advanced degenerative changes at C5-6 and mild to moderate at C6-7.

She also had severe hypertrophy of the uncovertebral joints bilaterally at

C5-6.  She was diagnosed with right cervical brachial pain and

radiculopathy secondary to osteophyte complexes at C5/6 and C6/7, insulin

dependent diabetes mellitus, hyperthyroidism and tobacco abuse.  He

recommended that she undergo surgical intervention since she had failed

conservative treatment.  *Id.*

The surgical notes dated April 16, 2013, reveal Dr. Scott's rationale

for the surgery.  She was noted to have MRI findings that demonstrated

severe foraminal narrowing due to spondylostenosis at C5-6 and a disk

protrusion to the right at C5-C6-C7.  Tr. 475.  The surgical findings

confirmed severe spondylostenosis at C5-6, moderate at C6-7.  There was

also severe foraminal narrowing on the right at C5-6 and foraminal

extrusion to the right of C6-7.  She underwent a cervical discectomy and

microsurgical decompression of the spinal cord and roots at C5-6, C6-7,

anterior cervical arthrodesis at C5-6, C6-7 using perk cages novabone and

bone marrow aspirate and anterior cervical instrumentation.  *Id.*

On April 24, 2013, her staples were removed.  Tr. 474.  She was

fitted with a bone growth stimulator and instructed on its use and was told

to continue to wear her hard collar.  *Id.*  On June 10, 2013, she presented

for a cervical fusion routine follow-up with Dr. Scott, several months after

cervical surgery on April 16, 2013.  Plaintiff stated that "she is doing very well.  She is pain free."  Her incision was "very well healed.  Her upper extremity strength is intact.  She does continue to wear her bone growth stimulator."  Tr. 473.  She was advised to wear the bone growth stimulator for at least six more months.  *Id.*  In a separate report date June 10, 2013, the radiologist noted, in part, "[f]lexion is limited with a slight anterior subluxation of C4 upon C5 measuring about 2 mm in flexion and reduced in extension.  That C4-5 disc space is slightly narrowed anteriorly.  No other abnormality is apparent."  The radiologist's impression was status post anterior cervical spinal fusion (ACDF) C5-C7 and "[m]inimal degenerative change and abnormal motion at C4-5."  Tr. 472.

Dr. Scott reexamined Plaintiff on September 4, 2013, post-cervical fusion.  Tr. 471.  "She is doing very well.  Her only symptoms are some hand numbness, especially at nighttime."  *Id.*  She was advised to wear the bone stimulator for an additional four months.  They discussed "possible carpal tunnel syndrome and possible work-up and treatment of this, however, she does not wish to pursue this at this time."  *Id.*

On January 10, 2014, Dr. Scott noted that Plaintiff was doing well from her ACDF, but continued to have some discomfort in the trapezius. Dr. Reddy had prescribed a compound ointment, which Plaintiff rubbed in

and was helpful.  Tr. 469.  Plaintiff noticed a problem with pain in her right hand and difficulty using a computer mouse.  As noted, she still had some trapezius discomfort and was referred to Dr. Reddy for further testing (EMG/nerve conduction study for suspected carpel tunnel syndrome).[11]  *Id.*

Dr. Wagh treated Plaintiff for diabetes mellitus on March 12, 2014. Tr. 484.  Her hemoglobin A1C was elevated at 8.1.  She diagnosed Plaintiff with diabetes mellitus, hyperlipidemia and hyperthyroidism and was continued on her medication.  *Id.*  It is again noted that Plaintiff exercises regularly and appropriately for her age and health, predominantly swimming.  Tr. 485.  Neck, back, joint, and muscle pain and muscle weakness are noted.  *Id.*

Plaintiff was examined by Dr. Reddy on April 3, 2014.  Tr. 493-98. Plaintiff complained of current pain in her hand, forearms, and sciatica in both legs.  Her current pain intensity was described as 5/10.  Tr. 493. Plaintiff denied back and muscle pain and persistent pain in her joints. Tr. 494.  The results of Dr. Reddy's physical examination, which included musculoskeletal and neurological aspects, were similar to prior physical examination results, Tr. 495-96.  *Compare with* Tr. 228-32, 237-40, 247, 360-63, 424-26, 443-44, 446-52, 454-55, 457-61, 463-64, 504-05.

---

[11]  The ALJ entered his decision on February 27, 2014.  Tr. 38.

Additionally, after the ALJ issued his decision, *see supra* at 34 n.11,

Plaintiff underwent an MRI of the lumbar spine performed on April 4, 2014.

Tr. 492, 500-01.[12]  The findings in the MRI report stated: "The height of the

vertebral bodies are normal.  There is marked disc space narrowing at L4-5

with a mixture of modic one, two, three changes.  There is no

spondylolisthesis." Tr. 500.  The impression was "[a]dvanced L4-5

degeneration with mild L4 retrospondylolisthesis of L4 and moderate

narrowing of right L4-5 foramen." *Id.*  Plaintiff was referred for a L4

transforaminal epidural steroid injection.  *Id.*

On May 1, 2014, Dr. Reddy examined Plaintiff who complained of

current pain in the lower extremities and described it as "aching," with the

current reported pain intensity of 5/10.  Tr. 503.  The patient notes under

the objective portion of the examination, including musculoskeletal,

extremities, neurological, and psychiatric were similar to prior reports.

Tr. 504-05; *see* Tr. 228-32, 237-40, 247, 360-63, 424-26, 443-44, 446-52,

454-55, 457-61, 463-64, 495-96.  Plaintiff was prescribed Norco.  Tr. 505.

A home exercise program was included in the care plan.  *Id.*  A referral to

Dr. Scott was recommended for surgical opinion.  Continued management

---

[12]  The Appeals Council only mentioned having considered Exhibits 17F and 18F, pages 492 through 516.  Tr. 4-5.

and massage therapy with Dr. Hoehn for chiropractic management was noted.  Topical compound analgesic was ordered for hand pain and CTS symptoms and Zanaflex was recommended for muscle spasms.  Lortab was refilled, which Plaintiff used occasionally limited to severe "IBP only."  Tr. 506.

On May 30, 2014, Plaintiff saw Dr. Scott.  Tr. 492.  Dr. Scott noted that it was more than a year out from her "ACDF" and she reported that her symptoms were fairly stable from that standpoint.  Dr. Scott noted that when he saw Plaintiff in January 2014 she was having some problems with her right hand while using a computer mouse.  An EMG/nerve conduction study was suggested and later performed.[13]  Dr. Reddy reported that the study showed carpal tunnel syndrome and Dr. Scott requested the results.  *Id.*  It is also noted that Plaintiff had problems with back pain, right buttock, and leg pain.  The EMG/nerve conduction study of the lower extremities was normal as per a report of May 1, 2014.  *Id.*  Dr. Scott provided his

---

[13]  On May 1, 2014, Dr. Reddy performed an EMG and NCV of Plaintiff's lumbar spine and lower extremity.  Tr. 507-09; *see supra* at 28-29 n.9.  Dr. Reddy noted that it was a normal study; no evidence of lumbar motor radiculopathy, although Plaintiff was having lumbar radicular pain to the hip and leg with a normal EMG; and no evidence of generalized polyneuropathy.  Tr. 509.  In his decision the ALJ mentioned a nerve conduction test, but declined to await the results, "as it is highly unlikely to have any impact on the claimant's [RFC]."  Tr. 36.  The ALJ further stated: "At the time the undersigned drafted this decision, which was significantly after the date the claimant reported that she was going to have the study, the study was not available.  The undersigned already assessed more restrictive limitations than that justified by the record."  Tr. 36.

assessment of the April 4, 2014, MRI.  Dr. Scott's impression included post

laminectomy syndrome with right L4-5 stenosis and status post left L4-5

discectomy.  Dr. Scott noted that Dr. Valentine would be requested to

perform a right L4 transforaminal ESI.  *Id.*

On June 5, 2014, Dr. Valentine treated Plaintiff.  Tr. 510-16.  Plaintiff

presented with low back and right leg pain and described it as aching and

throbbing.  The intensity was 7/10.  Tr. 510.  Under cerebellum, it is noted:

"The gait is normal the patient can walk several steps, then turn, and come

back; balance is easy, the arms swing at the sides, and turns are

accomplished smoothly."  Plaintiff was oriented; thought processes were

coherent and insight good.  No pain behaviors were noted.  Tr. 511.  She

was diagnosed with right L4-5 foramina stenosis with neurogenic

claudication, thoracic/lumbosacral neuritis (unspecified) and lumbar spinal

stenosis.  Plaintiff received a lumbar transforaminal epidural injection at L4.

*Id.*

## V.  Legal Analysis

Plaintiff argues that the Commissioner's decision to deny her benefits

should be reversed because the ALJ's rejection of the opinion of treating

physician, Dr. Reddy, is not supported by substantial evidence and that the

Appeals Council erred in not remanding the case to the ALJ for evaluation

of Plaintiff's treating neurosurgeon's (Dr. Scott) patient records that pre- and post-date the ALJ's decision.  ECF No. 12 at 1, 13-24.

The ALJ provided a skillful analysis of the relevant facts presented in this record and particularly when he determined whether Plaintiff's impairments were severe or non-severe at step two and when he assessed Plaintiff's RFC.  Tr. 29-37.

Plaintiff performed past work as a state trooper.  During her employment and, thereafter, Plaintiff was examined and treated by a host of healthcare providers for a myriad of health related issues, including those found to be severe such as degenerative disc disease of the cervical spine and lumbar disc displacement, Tr. 29, as well as other impairments that were rated as non-severe such as diabetes and hyperglycemia, Graves disease, thyroid disorder, problems with her left elbow and bursitis, allergies and urinary incontinence, and depression.  Tr. 30-31.

The ALJ discusses her examination and treatment from 2010 through 2013, which included noting conflicting reports by Plaintiff to some of the healthcare providers.  Tr. 32-36.  For example, the ALJ noted that records from August to September 2011 revealed that Plaintiff sought treatment for a few years for low back and neck pain.  Tr. 32.  Dr. Wagh treated Plaintiff for diabetes-related problems for several years (2010-2013).  Other

healthcare providers, including Drs. Valentine and Reddy and Dr. Hoehn (a

chiropractor), routinely treated Plaintiff for neck, back, and muscle pain.

Tr. 32-36.  The ALJ makes much of comparing Dr. Wagh's patient notes

with the other patient notes as those latter notes record Plaintiff's report of

muscle, back, and neck pain and Dr. Wagh's patient notes do not include

the same "level of symptoms."  Tr. 32-33.  Further, the ALJ notes that

Dr. Wagh's records from March to September 2012, stated that Plaintiff

"reported intermittent 'muscle pain,' 'back pain,' and 'neck pain,'" and that

"[t]he treatment records were dedicated chiefly to discussing the claimant's

diabetes and hyperthyroidism."  Tr. 33.  The ALJ continued:

> Dr. Wagh provided no details about the claimant's musculoskeletal
> complaints.  The claimant reported that despite her muscle pain she
> swims for exercise and works in the yard.  The claimant reported that
> she had "retired" from her job.  Dr. Wagh noted completely normal
> physical and musculoskeletal examinations.  Dr. Wagh did not
> diagnose the claimant with the musculoskeletal impairment or
> recommend any treatment for her muscle pain.  Pain medications
> were not listed among her medications.  (Exhibit 5F/04-09, 11F).
>
> On November 07, 2012, the claimant sought evaluation with
> chiropractor J. Hoehn, DC.  The claimant had been seeking
> intermittent chiropractic manipulation from Dr. Hoehn since 2010.
> (Exhibit 4F).  The claimant reported a wide range of musculoskeletal
> symptoms (pain, stiffness, muscle spasms) throughout her shoulders,
> wrists, scapula, low back, mid back, upper back, neck, and head.
> Claimant described the symptoms as a 7 out of 10, increased by
> sitting, lifting, time on the computer, and bending.  The undersigned
> *wonders* why the claimant did not report this level of symptoms to
> Dr. Wagh, who examined the claimant just a few months prior [on
> June 20, 2012, Tr. 416; Sept. 12, 2012, Tr. 409].

Dr. Hoehn noted malposition, hypertonicity, trigger points, and tenderness.  The undersigned notes that Dr. Hoehn's clinical findings are highly inconsistent with the normal musculoskeletal findings noted by Dr. Wagh just a few months prior.  Dr. Hoehn diagnosed cervicalgia, thorcalgia, lumbago, muscle spasms, myalgia/myositis, and headaches.  Dr. Hoehn recommended chiropractic manipulation and home stretching.  (Exhibit 13F).  The claimant reported improvement with treatment, such that by January and February 2013 pain was down to 4-5/10 from a high of 7/10.  (Exhibit 13F/12.).

Tr. 33-34 (emphasis added).  (Earlier in his decision, the ALJ expressed his wonder "why the claimant did not mention back pain to Dr. Wagh" after receiving treatment for a few years for low back and neck pain.  Tr. 32. Some patient notes from Drs. Valentine and Reddy were sent to Drs. Wagh, Hoehn, and Ashley.  *See, e.g.*, Tr. 447, 452-53.)  The ALJ continued to discuss records from 2013 that did "not reveal any objective worsening in the claimant symptoms."  Tr. 34.  The ALJ then explained that his RFC assessment and restriction to light work in light of a May 2, 2011, x-ray of Plaintiff's cervical spine, a 2012 MRI of Plaintiff's cervical spine, the 2011-2013 clinical findings of Drs. Valentine and Reddy, similar clinical findings by Dr. Hoehn, other medical findings, Tr. 34, and Plaintiff's "activities of daily living."  Tr. 34-35.  The ALJ then discussed several credibility factors that were adverse to Plaintiff.  *Id.*

Next, and relevant to Plaintiff's second argument, the ALJ discussed Plaintiff's cervical fusion.

> The claimant testified that she underwent a cervical fusion performed by Dr. Scott in April 2013 yet the claimant did not provide an operative report and a June 2013 record makes no mention of a cervical fusion.  (Exhibit 11F/1-04).  The claimant reported that she received very good relief from the symptoms for a few months, but that the symptoms then improved.  Dr. Reddy did not note in his November 2013 record that the claimant underwent a cervical fusion in April 2013.  (Exhibit 14 F/04).  *Even if the claimant did,* it must have helped her symptoms because the claimant reported improvement, such that she was exercising regularly doing yard work.  (Exhibit 11F/01).

Tr. 35 (emphasis added).  Exhibit 11F/01 refers to Dr. Wagh's patient note of June 12, 2013, in which Plaintiff stated that "[s]he just had neck surgery for cervical fusion."  Tr. 397.  Dr. Wagh noted that Plaintiff worked in her yard, did no aerobic exercise, and reported that her hypoglycemia was almost daily in the daytime.  *Id.*  At this time, Dr. Wagh also noted that Plaintiff "exercises fairly regularly and appropriately for age and health, predominantly swimming."  Tr. 398.  A review of systems indicated, in part, that Plaintiff had neck and back pain.  *Id.*  (Plaintiff first reported muscle, neck, and back pain to Dr. Wagh on June 20, 2012, Tr. 416, having mentioned back pain on April 12, 2012, Tr. 290.)  The ALJ continued to compare Plaintiff's testimony and her daily activities with what she told her healthcare providers, concluding that there were inconsistencies.  Tr. 35-36.  The ALJ also declined to wait for the results of the reported nerve

conduction study, *see supra* at 36 n.13, "[g]iven the very significant lack of upper extremity objective findings."  Tr. 36.

Having previously discussed relevant excerpts from Dr. Reddy's patient notes, the ALJ rejected the opinion rendered by Dr. Reddy in his medical source statement of October 2013 that Plaintiff's limitations were "consistent with a very restricted range of sedentary work."  Tr. 36.  The ALJ gave "very limited weight" to this opinion, assuming it "was completed by Dr. Reddy and no weight if it was completed by a non-acceptable medical source."  *Id.*  As noted herein, *see supra* at 25 n.7, the ALJ assumed the medical source statement was completed by Dr. Reddy. Tr. 36.

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim. *See* 20 C.F.R. § 404.1512(a); <u>Moore v. Barnhart</u>, 405 F.3d at 1211.  On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record.  <u>Brown v. Shalala</u>, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R. § 404.1512(d).  *See* <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (citing <u>Schaal v. Apfel</u>, 134 F.3d

496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")); 20 C.F.R. § 404.1520b.  Further, under Social Security Ruling 96-5p, 1996 SSR LEXIS 2, at *6 (July 2, 1996), the ALJ must make "every reasonable effort" to re-contact a medical source when the medical evidence does not support the source's opinion, and the ALJ cannot ascertain the basis for that opinion from the case record.  Vesy v. Astrue, 353 F. App'x 219, 225 (11th Cir. 2009) (unpublished).  The question here is whether there are "the kinds of gaps in the evidence necessary to demonstrate prejudice" to Plaintiff.  Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997).

Plaintiff does not expressly argue that the ALJ decided the case on an inadequate record.  ECF No. 12 at 1, 13-24.  Yet, this is an essential part of Plaintiff's claim of error.  Plaintiff called into question the ALJ's failure to acknowledge that Plaintiff had a cervical fusion in April 2013 and further stated that Plaintiff's counsel told the ALJ at the hearing that she had been trying to get the records from Dr. Scott for five months.  Tr. 56; ECF No. 12 at 18-23.  Plaintiff argues that the ALJ made a rush to judgment when evaluating and giving "very limited weight" to the opinion of Dr. Reddy, a treating physician, and "very significant weight" to the July 17,

2012, opinion of Dr. Bancks, a non-examining reviewer, without obtaining relevant patient records.  *Id.*; *see* Tr. 36-37.  The Court agrees, although Plaintiff's counsel could have helped the situation by expressly asking the ALJ to extend the time for closing the record.[14]  On the other hand, the ALJ should have offered to keep the record open for a time certain, *see, e.g., supra* at 30 n.10, knowing that relevant patient records would likely be forthcoming.[15]  The failure to fully and fairly develop the record, especially in light of the ALJ's characterization of the existing and missing records, was prejudicial to Plaintiff, *see* Graham v. Apfel, 129 F.3d at 1423, and requires a remand for the purpose of requiring the ALJ to review all of the patient records, including Exhibits 15F through 18F, Tr. 466-516, in conjunction with existing records and to reconsider Plaintiff's claim of disability.  *See generally* Cary v. Colvin, Case No. 8:15-CV-462-T-MAP, 2016 U.S. Dist. LEXIS 31618, at *8-9 (M.D., Fla. Mar. 11, 2016).  Further, the ALJ should be directed to consider whether he should re-contact one or more of Plaintiff's treating physicians and whether Plaintiff should be

---

[14]  If the sole issue before the Court involved the ALJ's assessment of Dr. Reddy's opinion expressed in his medical source statement, the Court would agree with the Commissioner that Dr. Reddy's opinion is not supported by his own treatment records.  *See* ECF No. 15 at 7-9.  But that is not the case here.

[15]  The hearing transpired on February 6, 2014, and the decision was entered on February 27, 2014.  Tr. 27, 38.

referred for an independent physical examination.  *See* <u>Salazar v. Comm'r of Soc. Sec.</u>, 372 F. App'x 64, 67 (11th Cir. 2010) (unpublished) (citing 20 C.F.R. § 404.1517).  But the ALJ "is not required to order additional examinations if the evidence in the record is sufficient to allow him to make an informed decision."  *Id.* (citing <u>Ingram v. Comm'r of Soc. Sec.</u>, 496 F.3d 1253, 1269 (11th Cir. 2007)).  The Court makes no determination whether Plaintiff is disabled.

## VI. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are not based upon substantial evidence in the record and he did not correctly follow the law.  Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** for further

proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on July 13, 2016.

**s/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**